Christopher P. Lynett
Armstrong Teasdale, LLP
2005 Market Street, 29th Floor
Philadelphia, PA 19027
clynett@atllp.com
570-510-1690

*Attorney for Plaintiff Dwayne Scott*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Dwayne Scott, | : | |
| Plaintiff | : | |
| v. | : | Civ. No. _____-_____ |
| United States, Joshua Kiddish, | : | |
| Lt. Bodge, Lt. P. O'Kane, SO B. Price, | | |
| Lt. C. Frisk, Lt. J. Connor, SO C. Walker, | : | **CIVIL ACTION** |
| SO A. Simyan, SO R. Condella, | | |
| Charles Maiorana, and Michael Carvajal | : | **JURY DEMAND** |
| Defendants. | : | |
| | : | |

### COMPLAINT

**I.    Background**

1. This case involves the inhumane and unfortunate treatment of the plaintiff, Mr. Dwayne Scott, an individual previously incarcerated at USP-Canaan.

2. While he was housed there, Mr. Scott was an active inmate and participated in many programs to better himself.

3. At the same time, he did not sit idly by when prison staff violated his basic rights, and he routinely filed complaints against the offending parties regardless of their power over his everyday life.

1

4. When those administrative complaints began to frustrate BOP staffers, Mr. Scott was moved into a dangerous housing situation with another inmate, Jonathan Riley.

5. Mr. Riley had a lengthy disciplinary history of unprovoked attacks against his cellmates.

6. When Mr. Riley attacked Mr. Scott in his bed on January 3, 2020, prison officials—knowing full well that Mr. Scott suffers from a multitude of breathing conditions—sealed off his cell and filled it with pepper spray three times.

7. As the Bureau of Prisons ("BOP") was forced to acknowledge, Mr. Scott did nothing to warrant this excessive use of force that placed him, an individual diagnosed with Asthma, COPD, and related raspatory conditions, in unnecessary danger.

8. Instead, he merely attempted to defend himself from the very peril that BOP officials placed him in.

9. Despite this, these Federal actors placed his life at risk by using chemicals and agents that present a unique danger to people, like Mr. Scott, who suffer from serious breathing conditions.

10. Mr. Scott has petitioned the BOP using the appropriate administrative remedies, which have been denied and, thus, his claims are fully exhausted.

11. As such, Mr. Scott now appeals to this Court for relief.

**II.   Parties**

12. Plaintiff Dwayne Scott, an adult male currently housed at USP-Hazelton located at 1640 Sky View Dr, Bruceton Mills, West Virginia 26525. He was previously housed in USP-Canaan, located in the Wayne County, Pennsylvania.

13. Defendant United States of America, acting through the Department of Justice and, more specifically, the Federal Bureau of Prisons ("BOP").

14. Defendant Joshua Kiddish is a BOP employee in the Health Services Unit at USP-Canaan who, upon information and belief, resides in Pennsylvania.

15. Defendant Lt. Bodge is a BOP staff member at USP-Canaan whose responsibilities include assigning cellmates in the Special Housing Unit ("SHU") at Canaan who, upon information and belief, resides in Pennsylvania.

16. Defendant Lt. P. O'Kane is another BOP staff member at USP-Canaan who, upon information and belief, resides in Pennsylvania.

17. Defendant B. Price is a BOP-employed Security Officer at USP-Canaan who, upon information and belief, resides in Pennsylvania.

18. Defendant Lt. C. Frisk is a BOP-employed Lieutenant at USP-Canaan who, upon information and belief, resides in Pennsylvania.

19. Defendant Lt. J. Connor was at all relevant times an activities lieutenant employed by BOP at USP-Canaan who, upon information and belief, resides in Pennsylvania.

20. Defendant C. Walker was a BOP-employed Security Officer at USP-Canaan who, upon information and belief, resides in Pennsylvania. .

21. Defendant A. Simyan was a BOP-employed Security Officer at USP-Canaan who, upon information and belief, resides in Pennsylvania.

22. Defendant R. Condella was a BOP-employed Security Officer at USP-Canaan who, upon information and belief, resides in Pennsylvania.

23. Defendant Charles Maiorana is the Warden at USP-Canaan who, upon information and belief, resides in Pennsylvania.

24. Defendant Michael Carvajal, in his official capacity, is the Director of the Bureau of Prisons who, upon information and belief, resides in Washington, D.C.

### III. Jurisdiction and Venue

25. The Court has jurisdiction pursuant to 28 U.S.C. § 1346 because the United States is a party to this action.

26. This Court likewise has jurisdiction under 28 U.S.C. § 1331 as this matter alleges that numerous Federal Actors violated Mr. Scott's Constitutional Rights.

27. Venue is proper in this Court because a substantial part of the events giving rise to this action occurred at USP-Canaan, located at 3057 Eric J. Williams Memorial Dr, Waymart, PA 18472.

28. USP-Canaan is Bureau of Prisons Facility under the jurisdiction of the United States Department of Justice.

### IV. Facts

29. Fully aware that pepper spray is a dangerous chemical, BOP has policies that limit its use.

30. Specifically, BOP policy requires the spray be used at a distance of greater than four feet and be aimed specifically at the individual who is causing the disturbance, not just generally disbursed into a confined space.

31. The use of force policy likewise requires staff consult "medical staff . . . prior to staff using chemical agents, pepper mace, or non-lethal weapons[.]"

32. Here, Medical Staff was on-site and, indeed, called in the complaint.

33. Despite the presence of at least the following BOP staffers—Joshua Kiddish, B. Price, Lt. C. Frisk, Lt. J. Connor, C. Walker, A. Simyan, and R. Condella—none of those individuals consulted the on-site medical staffer about the use of pepper spray.

   a. **Retaliation**

34. Mr. Scott was an inmate at USP-Cannan.

35. Mr. Scott, due to his underlying medical conditions and need for special medical treatment, resided in the Special Housing Unit.

36. Mr. Scott has no history of fighting with or engaging in any aggressive action with his cellmates.

37. Prior to December 2019, Mr. Scott was housed with another inmate in the SHU.

38. However, that same month, at the direction of Lt. Bodge, Jonathan Riley was transferred into Mr. Scott's cell.

39. Mr. Riley had a well-known reputation and a lengthy history of infractions, which include numerous instances of unprovoked and violent attacks upon his cellmates and other individuals.

40. At the time Mr. Riley was moved into Mr. Scott's cell, there were other, empty cells on the unit where he could have been housed.

41. During his stay with Mr. Scott, Mr. Riley informed him that Lt. Bodge had put them together specifically because Mr. Scott filed too many administrative remedies related to conditions at USP-Canaan and related matters.

42. Mr. Scott, concerned about his safety, petitioned Lt. O'Kane and asked him if the administration would consider relocating him to a cell with a less dangerous individual.

43. Lt. O'Kane denied this request and affirmed Lt. Bodge's decision.

44. Mr. Scott likewise made numerous "cop outs"—or administrative requests—to be moved to a location with a less dangerous individuals.

45. Indeed, this request could have easily been accommodated because there were multiple open cells in the SHU available.

46. Had Mr. Riley been relocated to one of the open cells (or Mr. Scott, for that matter), he would no longer present the same danger to Mr. Scott or anyone else.

47. Despite these repeated requests to numerous individuals, Mr. Riley remained as Mr. Scott's cellmate for just over a month.

48. However, on January 3, 2020, the attack Mr. Scott feared came to fruition.

   b. **Failure to Protect**

49. In the late afternoon on January 3, 2020, Joshua Kiddish was making his rounds to provide medicine to prisons.

50. He approached Mr. Scott's cell to hand him a battery for his CPAP machine.

51. This prison-issued machine was necessary for Mr. Scott, who has been diagnosed with Asthma, COPD, and other raspatory illnesses.

52. Prison officials, including the named defendants at USP-Canaan knew or should have known of Mr. Scott's afflictions as he was routinely treated by doctors at that facility, who documented the above conditions.

53. As Mr. Kiddish approached the cell, Mr. Riley—as he has done before—launched his attack upon Mr. Scott.

54. Mr. Riley punched and struck Mr. Scott, who was trapped on the top bunk and could not move.

55. Mr. Kiddish, who knew of Mr. Scott's need for a CPAP machine, alerted staff to the attack.

56. At least six staff members—Lieutenants C. Frisk and J. Connor, and Security Officers B. Price, C. Walker, A. Simyan, and R. Condella—all responded to the call.

57. When they arrived, Mr. Scott was in a vulnerable position as he could not get down off of the top bunk and was forced to defend himself from a partially reclined position.

58. The officers ordered Mr. Riley to cease his attack, but he did not.

59. Rather than opening the cell door to restrain the two inmates, Senior Officer Price immediately escalated to the use of BOP-issued pepper spray.

60. Before he did so, however, the air vent to the cell was shut—essentially sealing off any ventilation and ensuring whatever chemicals were introduced into the cell would remain until the door was opened.

61. Likewise, no officers inquired about any reason that using chemical pepper spray and similar items might be unadvisable in light of Mr. Scott's medical conditions.

62. Nor did Mr. Kiddish make any effort to alert staff of the risk use of pepper spray or a similar agent may pose to Mr. Scott.

63. This was a violation of BOP policy, noted above.

   c.  **Excessive Use of Force**

64. Senior Officer Price then sprayed a stream of oleoresin capsicum, more commonly known as "pepper spray," into the cell.

65. When this happened, Mr. Riley's attack ceased as he dropped to the floor and retreated toward the shower area of the cell.

66. Mr. Scott was able to get off his bunk and get to the floor.

67. At this point, Mr. Riley's attack had ceased and neither individual presented any danger to each other or the waiting BOP staffers.

68. Despite all of this, Senior Officer Price fired second stream of pepper spray in Mr. Scott's cell, further saturating the air with these harsh, dangerous chemicals.

69. At this point, Mr. Riley's attack had long since ceased; neither he nor Mr. Scott presented any danger to themselves, each other, or BOP staff.

70. Despite this, Lt. C. Frisk decided to raise the stakes by using a gas-powered firearm to fire multiple capsules filled with more oleoresin capsicum (the chemical name for pepper spray) into the confined area.

71. These capsules struck the back of the cell, near the shower area and exploded their contents into the air, further contaminating the cell with pepper spray.

72. Again, this unnecessary use of force—which occurred after Mr. Riley had ended his attack on Mr. Scott and both men were on the floor—was used without regard to any risk it may pose to Mr. Scott.

73. During this entire onslaught, Mr. Scott was in fear of dying as his medical conditions raise the risk of a severe or life-threatening reaction to pepper spray.

74. Both Mr. Scott and Mr. Riley were then ordered to stand and place their hands through the cell door.

75. They both complied.

76. Each man's hands were secured behind his back prior to the officers entering the cell.

77. The two men were then escorted by prison staff for showers and decontamination.

78. A camera outside of Mr. Scott's cell recorded the officers' actions.

79. Due to the nature of the attack and the fact that Mr. Scott filed an administrative tort claim with respect to this incident, that video should have been preserved by BOP in anticipation of this litigation.

80. Likewise, BOP use-of-force policy requires such incidents, where practical, be recorded using a camera.

81. Thus, the video should have also been preserved consistent with that policy.

82. BOP staff took photographs of injuries Mr. Scott suffered as a result of Mr. Riley's unprovoked attack.

83. Later, Lieutenants C. Frisk and J. Connor, and Senior Officers B. Price, C. Walker, A. Simyan, and R. Condella filed reports about this incident.

84. The reports from Security Officer Price and Lt. Frisk each state, in identical language, that Mr. Scott and Mr. Riley "continued to be combative with each other by pushing and shoving" each other, despite both individuals having their hands securely restrained behind their backs.

85. Contemporaneous reports from Lt. Connor and Mr. Kiddish, however, make no mention of this "pushing and shoving" incident.

86. Mr. Scott does not have statements from C. Walker, A. Simyan, and R. Condella; he therefore does not know what, if anything, these individuals observed or documented.

87. Mr. Scott was treated for bumps and bruises resulting from Mr. Riley's attack. He was likewise treated for the use of the chemical sprays deployed during the attack.

## V. Claims

**Count One:** **Unlawful Retaliation in Violation of Mr. Scott's First Amendment Rights against Defendants Bodge and O'Kane.[1]**

88. Mr. Scott repeats and incorporates paragraphs 1–84, as fully set forth above.

89. Mr. Scott alleges that, in filing administrative requests and similar complaints about the conditions of his confinement, he was lawfully exercising his First Amendment rights.

---

[1] Under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

90. Lt. Bodge was aware of Mr. Scott's repeated petitions and, in turn, retaliated against Mr. Scott by placing him in a cell with Mr. Riley, who Lt. Bodge knew or should have known had a proclivity for attacking his cellmates.

91. And despite directly petitioning Lt. P. O'Kane and raising the above retaliation and safety concerns, Mr. Scott's requests for a new cellmate or other form of security were repeatedly denied.

92. Indeed, Lt. O'Kane fully ratified and supported Lt. Bodge's decision.

93. Because of the dangerous condition created by Lt. Bodge and Lt. O'Kane, Mr. Scott suffered the unprovoked attack by Mr. Riley on January 3, 2022.

94. The attack on January 3, 2022—because of Mr. Riley's repeated attacks on his cellmates—was the reasonable and foreseeable consequence of Lt. Bodge's and Lt. O'Kane's decision to retaliate against Mr. Scott.

**Count Two: Failure to Protect in Violation of Mr. Scott's Eighth Amendment Rights against Defendants Bodge, O'Kane, and Charles Maiorana. [2]**

95. Mr. Scott repeats and incorporates paragraphs 1–84, as fully set forth above.

96. Lt. Bodge knew or should have known that Mr. Riley had a proclivity for attacking his cellmates without cause.

97. Indeed, Mr. Scott brought these concerns to BOP staff—including Lt. Bodge and Lt. O'Kane specifically—and requested a transfer to a less dangerous situation.

---

[2] Under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

98. In light of Mr. Riley's known dangerousness and Mr. Scott's repeated requests for a transfer, Lt. Bodge and Lt. O'Kane knew or should have known that in order to adequately protect Mr. Scott, he should be transferred to a less-dangerous situation.

99. Lt. Bodge's decision to place Mr. Scott in this life-threatening situation, a decision that was ratified and affirmed by Lt. O'Kane, placed Mr. Scott in a more dangerous situation than he otherwise would have been.

100. Indeed, Mr. Scott had no prior incidents with his cellmates while at USP-Canaan.

101. Lt. Bodge's decision, which was supported and ratified by Lt. P. O'Kane, was a violation of Mr. Scott's Eighth Amendment Right against cruel and unusual punishment.

102. The attack on January 3, 2022—because of Mr. Riley's repeated attacks on his cellmates—was the reasonable and foreseeable consequence of Lt. Bodge's and Lt. O'Kane's decision to place Mr. Scott in a more dangerous situation than otherwise would have existed.

103. As two high-ranking officials with decision-making power—Lt. Bodge and Lt. O'Kane—were aware of the danger and failed to act, they were acting pursuant to a custom, policy, or routine practice that was known or should have been known by Warden Charles Maiorana.

104. Specifically, in light of Mr. Riley's well-known danger and his repeated attacks on cellmates, Warden Maiorana knew or should have known that Mr. Riley presented a danger to his cellmates.

105. Yet no prison official took any action to ensure that Mr. Riley was not a danger to other inmates.

106. The attack and resulting injuries were the reasonable and foreseeable outcome of the actions (or inaction) of Lt. Bodge, Lt. O'Kane, and Warden Maiorana.

**Count Three: Excessive Use of Force in Violation of Mr. Scott's Eighth Amendment Rights against Defendants B. Price, C. Frisk and Michael Carvajal.³**

107. Mr. Scott repeats and incorporates paragraphs 1–84, as fully set forth above.

108. On January 3, 2020, as a direct result of Lt. Bodge's initial actions and Lt. O' Kane's failure to act, Mr. Scott was attacked by Mr. Riley in his cell.

109. After B. Price knew or should have known that Mr. Riley's attack had ended, any additional use of pepper spray was both unnecessary and unreasonable in light of the totality of the circumstances.

110. Despite this knowledge, B. Price again deployed pepper spray into Mr. Scott's cell a second time without any justification.

111. The unwarranted use of pepper spray was not needed to control Mr. Riley or protect Mr. Scott or any BOP staff and constituted a violation of Mr. Scott's Eighth Amendment right to be free of cruel and unusual punishment.

112. Lt. C. Frisk's use of the pepper-spray filled balls was even more egregious.

113. As described above, by the time Lt. Frisk fired into the cell, the attack had ceased; Mr. Riley was huddled in the back of the cell and Mr. Scott was in the front of the cell on the ground.

114. The absence of a clear and present danger did not stop Lt. Frisk from firing a volley of pepper-spray rounds into the cell.

115. Lt. C. Frisk used excessive use of force under the circumstances.

116. Despite knowing that use of pepper spray is dangerous and that its' policies are outdated, the Bureau of Prisons, through its director, Michael Carvajal, continues to allow BOP

---

³ Under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

staffers to employ pepper spray in a manner that is dangerous to vulnerable inmates, like Mr. Scott.

**Count Four: Failure to Protect from Excessive Force in Violation of Mr. Scott's Eighth Amendment Right against Joshua Kiddish, Lt. J. Connor, C. Walker, A. Simyan, and R. Condella.[4]**

117. Mr. Scott repeats and incorporates paragraphs 1–84, as fully set forth above.

118. On January 3, 2020, Mr. Kiddish was distributing medical equipment to Mr. Scott when he observed Mr. Riley begin his attack.

119. Despite knowing of Mr. Scott's unique vulnerability to pepper spray, Mr. Kiddish never sought to inform the other responding officers to that risk.

120. Likewise, the other responding BOP personnel—Lt. J. Connor, C. Walker, A. Simyan, and R. Condella—despite being aware of BOP's policy and requirement that medical staff be consulted when using pepper spray on a vulnerable inmate, took no action.

121. Upon information and belief, these officers were aware of Mr. Scott's disabilities and diagnoses, yet took no actions to halt the excessive, unwarranted, and unnecessary use of pepper spray; specifically, the second use of spray by B. Price and the use of the pepper-spray balls used by Lt. C. Frisk.

122. Their failure to act under the circumstances constituted a violation of Mr. Scott's right to be free of cruel and unusual punishment under the Eighth Amendment.

**Count Five:   Federal Torts Claim Act Against the United States through its named agents.**

123. Mr. Scott repeats and incorporates paragraphs 1–113, as fully set forth above.

---

[4] Under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

124. As an alternative form of liability, Mr. Scott asserts that the United States, pursuant to 28 U.S.C. § 1346 is liable for damages of its agents and employees.

125. Specifically, Defendants Bodge, O'Kane, and Charles Maiorana acted intentionally, willfully, or negligently when they placed Mr. Scott in a cell with Mr. Riley, which resulted in the attack by Mr. Riley upon Mr. Scott. Mr. Riley's attack was the reasonable and foreseeable consequence of their actions.

126. Defendants B. Price and C. Frisk acted intentionally, willfully, or negligently when they repeatedly and without justification sprayed harmful chemical into Mr. Scott's cell and unjustifiably assaulted and battered him.

127. And Defendants Joshua Kiddish, Lt. J. Connor, C. Walker, A. Simyan, and R. Condella violated a known duty to warn and stop their colleagues from continuing and escalating the unnecessary assault on Mr. Scott. Joshua Kiddish, Lt. J. Connor, C. Walker, A. Simyan, and R. Condella negligently failed to alert their colleagues to the known danger.

## VI. Prayer for Relief

128. For Count One:

    i. An amount of compensatory damages to be established at trial;

    ii. An amount of punitive damages to be established at trial;

    iii. Reasonable Attorney's Fees and Litigation Costs;

    iv. Pre- and post-judgment interest;

    v. Any other relief the Court deems appropriate.

129. Found Count Two:

    i. An amount of compensatory damages to be established at trial;

    ii. An amount of punitive damages to be established at trial;

      iii.    Reasonable Attorney's Fees and Litigation Costs;

      iv.    Pre- and post-judgment interest;

      v.    An agreement from BOP to alter its policies with respect to use of Pepper Spray;

      vi.    Any other relief the Court deems appropriate.

130.    For Count Three:

      i.    An amount of compensatory damages to be established at trial;

      ii.    An amount of punitive damages to be established at trial;

      iii.    Reasonable Attorney's Fees and Litigation Costs;

      iv.    Pre- and post-judgment interest;

      v.    Any other relief the Court deems appropriate.

131.    For Count Four:

      i.    An amount of compensatory damages to be established at trial;

      ii.    An amount of punitive damages to be established at trial;

      iii.    Reasonable Attorney's Fees and Litigation Costs;

      iv.    Pre- and post-judgment interest;

      v.    Any other relief the Court deems appropriate.

132.    For Count Five:

      i.    An amount of compensatory damages to be established at trial;

      ii.    Reasonable Attorney's Fees and Litigation Costs;

      iii.    Pre- and post-judgment interest;

      iv.    Any other relief the Court deems appropriate.

133.    Mr. Scott demands a jury trial on all issues that can be resolved by a jury.

Dated: January 3, 2022                    Respectfully Submitted,

/s/ *Christopher P. Lynett*
Christopher P. Lynett
Armstrong Teasdale, LLP
2005 Market Street, 29th Floor
Philadelphia, PA 19027
clynett@atllp.com
570-510-1690